# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**STANLEY PATTERSON,**
        **Plaintiff,**

    **v.**                                  **Case No. 05-C-1120**

**JO ANNE B. BARNHART,**
**Commissioner of the Social Security Administration,**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Stanley Patterson applied for social security disability benefits, alleging that he was unable to work due to wrist, shoulder, neck and knee problems, a seizure disorder, chest pain and depression.  The Social Security Administration ("SSA") denied his claim, as did an Administrative Law Judge ("ALJ") following a hearing.  The Appeals Council then denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of the SSA.  Briscoe v. Barnhart, 425 F.3d 345, 350 (7th Cir. 2005).  Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## I.  APPLICABLE STANDARDS OF REVIEW

### A.     ALJ's Decision

Under § 405(g), the district court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and consistent with applicable law.  Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion.  Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  Thus, where conflicting evidence would

allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. Id. The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

**B.    Disability Claim**

In order to obtain disability benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently engaged in substantial gainful activity ("SGA");[1] (2) if not, whether the claimant has a severe impairment or combination of impairments;[2] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively

---

[1]"Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." § 416.972(b). The SSA does "not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." § 416.972(c).

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

2

disabling;[3] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[4] and (5) if not, whether the claimant is able to perform any other work in the national economy.  Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled.  A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. The claimant carries the burden at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy.  Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).  The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience.  However, the ALJ may not rely on the Grid to deny a claim if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work.  In such a case, the ALJ must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision.  Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

--------

[3]These impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

[4]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments.  SSR 96-8p.

3

## II.  FACTS AND BACKGROUND

### A.     Plaintiff's Application and Administrative Decisions

Plaintiff applied for disability insurance and supplemental security income benefits on August 13, 2001, alleging that he had been disabled since April 10, 2001.  (Tr. at 42; 558.) In his disability report, plaintiff wrote that he could no longer perform the lifting, walking or standing required of his past work. (Tr. at 72.)  He stated that he had been employed in various warehouses and factories in  2000 and 2001, as a filler for a paint company in 1998 and 1999, as a bailer for a clothing company from 1987 to 1998, and as a mover from 1984 to 1987, and that these jobs required him to stand/walk six+ hours out of an eight hour day and lift 50+ pounds frequently and 100+ pounds occasionally.  (Tr. at 73; see also Tr. at 151-52; 161-66.)  He indicated that he had completed high school with no additional education or vocational training.  (Tr. at 79.)

In activities questionnaires, plaintiff and his girlfriend wrote he mainly watched television, listened to music and spent time with his family. (Tr. at 91; 101.)  On a seizure questionnaire, the girlfriend wrote that plaintiff experienced seizures at night, consisting of shaking and jerking of the hands, arms, legs and feet lasting three to five minutes.  (Tr. at 97.)  She stated that he had experienced attacks on January 23, 1998, March 6, 1998 and August 15, 1998.  (Tr. at 97.)

The SSA denied the claim initially (Tr. at 26; 28; 556; 560) and on reconsideration (Tr. at 27; 34; 557; 565).  Plaintiff requested a hearing before an Administrative Law Judge (Tr. at 38; 569), and on September 10, 2004 he appeared with counsel before ALJ Margaret O'Grady (Tr. at 580).   Plaintiff and a VE were the only witnesses.

4

**B.** **The Hearing**

    **1.** **Plaintiff's Testimony**

Plaintiff testified that his date of birth was January 2, 1960, he was not married, had three children (ages 10, 17 and 22), was right handed, and stood 6'1" tall and weighed 193 pounds. (Tr. at 583.) He stated that he last worked in a foundry in March of 2001 as a deck hand, which required him to clap down molds so others could pour metal into them. (Tr. at 584.) He stated that he stopped working there because his attendance was bad, and he had trouble with his wrist and with heat exhaustion. He stated that his only current source of income was $141/month in food stamps, and that he lived in a homeless shelter called the Guest House. (Tr. at 585; 590.)

Plaintiff testified that he received mental health treatment from Healthcare for the Homeless, and that he felt depressed every day, had trouble concentrating, needed help with forms and isolated himself. (Tr. at 599-600.) He further stated that he experienced pain in both wrists and the right knee, for which he took medication without relief. (Tr. at 586-87.) He also testified that the medication made him drowsy and dizzy. (Tr. at 589.) At the time of the hearing, plaintiff had a cast on his right arm related to wrist surgery performed on July 9. He stated that the cast was to come off the next week. (Tr. at 593.) He said that he last had a seizure in September 2003. (Tr. at 597.)

Plaintiff testified that on a typical day he visited his mother and did a few things for her around the house, such as washing dishes, making beds, folding towels, cleaning and vacuuming, but he needed to take breaks between chores. (Tr. at 589-90; 598.) He said that he otherwise spent time with his kids and did volunteer work, which was mandatory at

5

the Guest House. The volunteer work involved handing out cups of juice, donuts and toast, and wiping down tables and chairs, for three hours per day, five day per week. (Tr. at 590.) Plaintiff said that he would not be able to volunteer full-time because he would have to stop and rest. (Tr. at 598.) He stated that out of the three hours he stood for about one hour and sat for the remainder. (Tr. at 601.) Plaintiff testified that he got around via public transportation and was able to care for his own personal hygiene. He stated that he lived with seven other men in a dorm at the Guest House, occasionally cooked, did his own laundry and watched TV. (Tr. at 591.) He stated that he got no exercise because it was too painful. He said that he stopped drinking in January or February of that year and last used crack cocaine about two years ago. (Tr. at 592-93.)

**2.    VE Testimony**

The VE, John Schroeder, stated that plaintiff's past employment as a factory worker and laborer was unskilled, medium to heavy work. (Tr. at 602.) The ALJ then posed several hypothetical questions. The first assumed a person 44 years old with plaintiff's educational and vocational background, limited to medium work with no climbing, balancing, working at heights or exposure to irritants, and only occasional stooping, kneeling, crawling and crouching, further limited to unskilled, simple, routine, repetitive jobs. The VE said that such a person could not perform plaintiff's past work but could perform other jobs such as assembler, packager and visual quality control inspector. (Tr. at 602-03.) If the person could not have public contact and only limited interaction with co-workers, the answer would not significantly change. If the person could not repetitively use the hands, none of those jobs could be done. (Tr. at 603.) However, such a person could work as an attendant monitor. If the person could use the hands only occasionally or have no to limited contact

6

with co-workers, the majority of the jobs could still be performed. (Tr. at 604.) However, If the person would miss at least four days of work per month the jobs could not be done. (Tr. at 605.)

## C. Medical Evidence

### 1. Physical Impairments

The medical records received by the ALJ revealed that plaintiff had problems with his wrists, neck, shoulders and knees, in addition to heart problems, seizures, and injuries he received in altercations and accidents.

#### a. Wrists

Plaintiff initially injured his right wrist in June 1990 while pulling a carton of clothes at work. He was diagnosed with a sprain, and provided with a short arm cast and anti-inflammatory medication. (Tr. at 183-84.) On September 17, 1997, plaintiff again injured his right wrist at work and was provided a splint. (Tr. at 194-95.) The injury initially improved, and he returned to limited duty. (Tr. at 192-93.) However, the symptoms continued (Tr. at 188-91) and on December 2 he underwent a nerve conduction study and EEG, which revealed right median neuropathy at the wrist. The doctor's assessment was right carpal tunnel, which was not responding to conservative management. (Tr. at 187.) Nevertheless, plaintiff returned to limited duty work on December 19. (Tr. at 185-86.)

In January 2003, plaintiff began seeing Dr. Kevin Weidman regarding his right wrist. (Tr. at 375-78.) On February 27, Dr. Weidman noted that plaintiff's grip strength was diminished bilaterally. (Tr. at 360-62.) On October 30, plaintiff again saw Dr. Weidman (Tr. at 412) and radiological scans revealed degenerative changes of the left wrist (Tr. at 409-

7

11).  On November 5, 2003, plaintiff underwent a whole body bone scan, which revealed possible osteoarthritis in the right wrist.  (Tr. at 457.)

In April 2004, plaintiff again sought treatment for his right wrist, and x-rays revealed degenerative joint disease, positive ulnar variance, possible old-traumatic change and some degenerative changes with spur at the ulnar side of the radio-ulnar joint.  (Tr. at 551-52.) Dr. Mysore Shivaram recommended conservative care (Tr. at 544), but plaintiff was later referred to Dr. Lewis Chamoy (Tr. at 543), who recommended surgery on the right wrist  (Tr. at 541-42).  On July 9, 2004, Dr. Chamoy performed a four bone fusion of the right wrist with excession of scaphoid.  His pre-operative diagnosis was scapholunate collapse of the right wrist.  (Tr. at 523-24; 540.)  Plaintiff returned to Dr. Chamoy on July 13 and 20 and was provided medication.  Dr. Chamoy predicted three to four months in a cast to heal.  (Tr. at 519-20.)  On July 20, Dr. Chamoy signed a report stating that plaintiff could not work after the surgery but did not specify for how long.  (Tr. at 529-30.)  On August 17, Dr. Chamoy noted that the pins were in good position and the fusion was progressing satisfactorily, but there was no evidence of healing, and plaintiff was put back in a short arm cast.  (Tr. at 516.)  As noted above, plaintiff was still in the cast at the time of the hearing on September 10, 2004.

### b.    Neck and Shoulders

On January 26, 1999, plaintiff injured his neck and left shoulder when he tripped over a hose at work. (Tr. at 54.)  In February and May 1999, plaintiff was seen at the Milwaukee Medical Clinic for right shoulder pain and radiculapathy.  (Tr. at 201-03.)  On November 5, 2003, plaintiff underwent a bone scan, which revealed possible osteoarthritis in both shoulders.  (Tr. at 457.)

8

### c. Knees

On August 8, 2001, plaintiff was seen at Sinai Samaritan Medical Center for knee pain, which he attributed to a slip on the ice in late December 2000 or early January 2001. He stated that since that time he had on and off swelling and the knee had locked up a few times. On examination, the doctor noted no swelling, and plaintiff's range of motion was full. X-rays showed adequate joint space, with some calcification. The impression was a right knee injury, with possible internal derangement. Plaintiff was scheduled for an MRI (Tr. at 224), which revealed a tear of the anterior cruciate ligament ("ACL") and an injury and possible tear to both the medial and lateral collateral ligaments, and degeneration and tear of the lateral meniscus (Tr. at 228).[5]

On January 9, 2003, plaintiff saw Dr. Weidman about the knee, who noted signs of a rupture of the ACL and suggested a reconstruction to stabilize the knee. (Tr. at 375-78.) On February 27, plaintiff again saw Dr. Weidman and was considering reconstruction of his ACL. (Tr. at 360-62.) Radiological scans taken on October 30, 2003, and a November 5, 2003 bone scan both revealed osteoarthritis of the right knee. (Tr. at 409-11; 457.) On February 7, 2004, plaintiff was seen in the Sinai ER for knee swelling and pain. (Tr. at 487-91.)

---

[5]Plaintiff was also treated for knee pain at the Isaac Coggs Health Center in 2001. However, the notes are handwritten and hard to decipher. (Tr. at 274-83.) X-rays taken at Columbia Hospital on May 23, 2001 revealed no significant abnormality, but the doctor recommended an MRI to evaluate possible internal derangement. (Tr. at 286.)

9

### d. Seizures

On August 18, 1998, plaintiff was seen at St. Joseph's Hospital Emergency Room for a seizure. (Tr. at 67.) On December 30, 2003, plaintiff underwent an electroencephalogram related to his seizure disorder, which was normal. (Tr. at 439-40.)

### e. Heart

On April 15, 2003, plaintiff was seen at the Sinai ER for heart palpitations and dizziness. He was "reeking of alcohol." (Tr. at 355.) The doctor ordered various tests to rule out coronary artery disease. (Tr. at 356-59.) The tests were conducted on May 22, 2003, and aside from mild left ventricular hypertrophy and mildly abnormal right ventricle function, were basically normal. (Tr. at 380-99.) Plaintiff returned to Sinai on June 4, 2003, with continued chest pains and was scheduled for additional tests. (Tr. at 437.) A June 13 note indicated that a stress test had been performed and was negative, and a cardiac catheterization was performed, which also produced normal results. (Tr. at 430-31.) An x-ray also showed a normal sized heart and clear lungs. (Tr. at 434.) He was seen again on June 25, and the doctor's impression was that the pain was non-cardiac in nature, possibly gastrointestinal or musculoskeletal. (Tr. at 420-21.) On September 23, 2003, plaintiff underwent a pulmonary function study, which revealed small airway obstructive impairment, likely related to smoking. He was encouraged to quit. (Tr. at 413-16.)

### f. Fights and Accidents

Plaintiff was also injured on several occasions in altercations and accidents. On June 18, 2000, plaintiff was seen at the Sinai ER after suffering a laceration to the left eye area in a fight. The wound was cleaned and stitched, and plaintiff was released. (Tr. at 204-17.)

10

On June 1, 2002, plaintiff was seen at Sinai for a left zygoma fracture, forehead contusion and multiple abrasions after being pushed down some stairs. He was discharged with medication and wound care instructions. (Tr. at 131; 342-51.) On June 13, 2002, he was seen at Sinai again complaining of injuries from an assault. He was intoxicated, with a BAC of 0.285, and had a facial laceration, which was sutured, and contusions to the right hand, but no fractures based on x-rays of the hand and mandible. (Tr. at 328-37.) On June 21, 2002, plaintiff returned to Sinai to have his sutures removed and was also noted to have a ganglion cyst on his right wrist. (Tr. at 321-23.)

Plaintiff was again seen at the Sinai ER on September 18, 2002, after being struck in the face during a fight. He was diagnosed with a right mandibular fracture, provided medication and released in stable condition. (Tr. at 311-20.)

On January 31, 2003, plaintiff was treated in the Sinai ER for left facial swelling after being hit in the face. X-rays and a CT scan were performed, which revealed no new fractures. He was given Vicodin and discharged home. (Tr. at 363-73.) On May 3, 2003, plaintiff was examined at Sinai in police custody for medical clearance. He was "medically . . . in good shape" and cleared to enter the jail.[6] (Tr. at 400-06.)

On November 2, 2003, plaintiff was treated at Sinai after again being assaulted, and no new fracture was noted in an x-ray. (Tr. at 459-69.) On November 24, 2003, plaintiff was seen at Sinai after crushing his thumb in a door. An x-ray revealed soft tissue swelling and no fracture (Tr. at 447), and he was given pain medication and discharged (Tr. at 441-56).

---

[6]The record also contains information about plaintiff's brushes with the law. In August 2003, he was convicted of battery and sentenced to six months jail stayed for 18 months probation. (Tr. at 159-60.) In May 1999, he was convicted of disorderly conduct and sentenced to 90 days jail stayed for 12 months probation. (Tr. at 157-58.)

11

Finally, on January 1, 2004, plaintiff was seen in the Sinai ER with a laceration to his foot after he stepped on something.  (Tr. at 494-99.)

### 2.    Mental Impairments

The record also contained evidence of plaintiff's depression and substance abuse issues.  On August 14, 2001, plaintiff saw Paul Barno, MS, of Milwaukee Health Services, regarding depression, secondary to a history of drug abuse.  Barno indicated that he would work with plaintiff to align him with various resources, including DVR.  (Tr. at 232-33.)

In October 2001, plaintiff began receiving treatment at Healthcare for the Homeless and was diagnosed with major depression, generalized arthritis, carpal tunnel syndrome of the right wrist, headaches and a possible seizure disorder.  He was prescribed several medications including Effexor, Klonopin and Neurontin. (Tr. at 292.) Dr. Kenneth Erdman's October 26, 2001, treatment noted indicated that plaintiff appeared despondent and was overwhelmed by the financial aspects of his life.  His mood was sad, his affect flat, and his eye contact poor. There was anhedonia[7] as well as anergia[8] present, and his judgment and reasoning were impaired.  Dr. Erdman's diagnosis was major depression with a GAF (Global Assessment of Functioning) of 45,[9] and he prescribed various medications.  (Tr. at 297-98.)

---

[7]"Anhedonia" is an absence of pleasure.  Stedman's Medical Dictionary 88 (27th ed. 2000).

[8]"Anergia" is a lack of energy.  Stedman's Medication Dictionary 76 (27th Ed. 2000).

[9]The note recorded a GAF of 145, but this was obviously a typographical error, because GAF, an assessment of the person's overall level of functioning, is set up on a 0-100 scale.  A score of 45 denotes serious symptoms or serious impairment in school, occupational or social functioning.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

12

Plaintiff saw Dr. Erdman again on January 8, 2002, and continued to be despondent. His medication had helped somewhat, but he still felt quite depressed. He complained of no side effects. Dr. Erdman increased plaintiff's dosages and referred him for behavioral psychotherapy. (Tr. at 295.) On May 14, 2002, Dr. Erdman noted that plaintiff continued to feel despondent, helpless and hopeless. His medication regimen was altered. (Tr. at 293.)

On December 4, 2003, plaintiff saw Dr. Eleazor San Augustin at Healthcare for the Homeless, and his mood and affect were blunted. The doctor assessed major depressive disorder, recurrent, and continued plaintiff's medications. (Tr. at 303.) On March 9, 2004, plaintiff returned to Dr. San Augustin, and the doctor noted that plaintiff was homeless, but that his appearance was cleaner than usual. His mood and affect were still depressed. Dr. San Augustin's assessment was major depressive disorder, recurrent, and he continued plaintiff's medications. (Tr. at 302.) On April 12, plaintiff saw Dr. San Augustin and remained depressed. Dr. San Augustin diagnosed major depressive disorder, recurrent, and increased his medication. (Tr. at 300.) On May 26, plaintiff was still depressed and his medications were continued.[10] (Tr. at 511.)

### 3. Treating Source Reports

On October 17, 2002, Dr. Stephen Hughes of the Isaac Coggs Center prepared a report, indicating that plaintiff had chronic knee, wrist and shoulder problems. He opined that plaintiff could lift no more than 30 pounds, 15 pounds frequently, stand and walk for four to six hours per work day, and sit at least six hours per work day. (Tr. at 253.) He found no

---

[10]Records from Healthcare for the Homeless also indicate that plaintiff underwent AODA counseling in July and August 2003. (Tr. at 290; 305.)

13

restriction in plaintiff's ability to use his hands, communicate and see, but opined that he could not repetitively bend or stoop. He listed no cognitive or mental health restrictions. He wrote that the restrictions expired on February 1, 2003. (Tr. at 253A.)

On April 15, 2004, Dr. San Augustin prepared a mental RFC questionnaire. His diagnosis was major depression with a GAF of 45 and a guarded prognosis. (Tr. at 505.) He wrote that plaintiff was unable to maintain regular attendance, complete a normal workday without interruptions from psychologically based symptoms, respond appropriately in changes in a routine work setting, and deal with normal work stress. (Tr. at 507.) He opined that plaintiff would be absent more than four days per month, and that he was not a malingerer. (Tr. at 509.) In a September 2, 2004 letter, Dr. San Augustin wrote that plaintiff's depression was not related to or secondary to his past alcohol and drug abuse. (Tr. at 510.)

On August 31, 2004, plaintiff's AODA counselor at the Guest House, Heika Spielbauer, wrote a letter to plaintiff's lawyer indicating that plaintiff had met the requirements of the program and maintained sobriety. She had not discharged him from treatment, however, because he required assistance in completing various life tasks, his thinking was disorganized, and he was forgetful. She wrote that she had known plaintiff for five months, and that his physical and psychological problems limited his ability to obtain and maintain a job. He had memory problems and his thought processes and ability to recall were disjointed. She concluded: "I do not often advocate to this extent for a client to receive Social Security Disability; partially because they don't need the benefits and partially because they are able to self-advocate. In Stanley's case, I hold a firm belief that he is unemployable and needs regular assistance to maintain a productive life style." (Tr. at 181.)

14

On May 18, 2004, Dr. Agha of the Isaac Coggs Health Center wrote a letter stating that plaintiff was "disabled for 6 months due to his medical condition." (Tr. at 504.)[11]

### 4. SSA Consultants

Plaintiff was also evaluated by several medical professionals at the behest of the SSA. On January 23, 2002, plaintiff was seen for a mental status exam by Nathan Glassman, M.D. Dr. Glassman diagnosed adjustment disorder with depressed mood and poly-substance dependence in remission, with a GAF of 55.[12] He opined that given his physical problems and past work as a laborer, the prognosis for plaintiff resuming full-time work was guarded. Dr. Glassman stated that plaintiff would need access to a pain clinic and a coordinating physician to avoid poly-pharmacy. (Tr. at 244.) Plaintiff appeared reasonably well able to understand, remember and carry out simple instructions, and was likely to respond reasonably well to supervisors and co-workers, with some question as to his response to directions to complete physically demanding work given his numerous somatic complaints. His concentration and attention in the work place appeared reasonably good, and he would likely withstand routine work stresses and changes unless compounded by physically challenging work. (Tr. at 244-45.)

On February 18, 2002, plaintiff was examined by SSA consultant William Kelley, M.D., regarding his physical problems. (Tr. at 246.) Dr. Kelley found that plaintiff could

---

[11]Plaintiff was seen at the Isaac Coggs Health Center for various ailments in 2003 and 2004, but the notes are hand written and hard to read. (Tr. at 470-84; 500-03.) Therefore, I cannot determine precisely the conditions for which Dr. Agha treated plaintiff.

[12]A score of 55 is indicative of moderate psychological symptoms. DSM-IV at 32-34.

15

rotate his neck right and left, but experienced discomfort when he hyperextended to five degrees. Plaintiff had normal range of flexion and extension of the hands and excellent grip strength bilaterally, and was able to button his buttons and use a pen. Plaintiff had normal range of motion of the left shoulder and right knee. He could walk heel-to-toe unrestricted, did not wobble and had excellent balance. Given these observations, Dr. Kelley was not certain of the extent of true pathology that was present with plaintiff's orthopedic system, as his subjective complaints did not correlate to the objective findings. Plaintiff did have a depressed affect. (Tr. at 250-51.)

On February 28, 2002, Dr. Michael Baumblatt prepared a physical RFC assessment report for the SSA, finding that plaintiff had no exertional, postural, manipulative, visual or communicative limitations, but could not work around hazards. (Tr. at 256-59.) On the same date, Jack Spear, Ph.D. completed a Psychiatric Review Technique form for the SSA, analyzing plaintiff under Listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders). (Tr. at 262.)[13] Under the B criteria, he found moderate limitations in maintaining

---

[13]The Listings of mental impairments consist of three sets of "criteria" - the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA. Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). There are four broad areas in which the SSA rates the degree of functional limitation: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The SSA rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two areas.

16

social functioning and in concentration, persistence and pace, mild limitations in activities of daily living, and one or two episodes of decompensation. (Tr. at 267.) In a mental RFC assessment, Dr. Spear found moderate limitations in 11 areas, and no significant limitations in 9. (Tr. at 260.) These reports were reviewed and approved by Keith Bauer, Ph.D. on October 28, 2002. (Tr. at 261, 262.)

## D. ALJ's Decision and Appeals Council Review

On November 17, 2004, the ALJ issued a decision denying the claim. She found that plaintiff was not engaged in SGA and had several severe impairments, but none that met or equaled a Listing. (Tr. at 19-20.) The ALJ then found that plaintiff retained the RFC for unskilled, simple, routine, repetitive work at the light exertional level that did not involve public contact, climbing, balancing, heights or hazards, or exposure to fumes, dust or other irritants. She further restricted him to limited interaction with co-workers and frequent but not constant use of the hands. Based on this RFC, the ALJ found that plaintiff could not return to his past work because it was performed at the medium to heavy exertional level. However, using Grid Rule 202.20 as a framework, the ALJ found at step five that there were a significant number of other jobs plaintiff could perform as identified by the VE, i.e. 2400 attendant/monitor positions. (Tr. at 22.) Therefore, the ALJ found plaintiff not disabled and

---

See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.B. If the claimant's severe mental impairment does not meet or equal a Listing, the ALJ must assess the claimant's mental RFC. § 404.1520a(d)(3). The mental RFC assessment complements the functional evaluation necessary for paragraphs B and C of the Listings by requiring consideration of an expanded list of work-related capacities, including the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting. Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003).

17

denied the claim.  (Tr. at 23.)  Plaintiff requested review by the Appeals Council (Tr. at 14), but on April 24, 2005, the Council denied his request (Tr. at 8).

### III.  DISCUSSION

Plaintiff argues that (1) the ALJ erred in assessing the credibility of his testimony; (2) the ALJ improperly rejected the opinions of treating source Dr. San Augustin and his AODA counselor, Ms. Spielbauer; (3) the ALJ inadequately assessed his RFC; and (4) the ALJ presented an incomplete hypothetical to the VE.

### A.    Credibility

#### 1.    Legal Standard

Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing.  <u>Windus v. Barnhart</u>, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004).  Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong."  <u>Jens v. Barnhart</u>, 347 F.3d 209, 213 (7th Cir. 2003).  "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision."  <u>Herron v. Shalala</u>, 19 F.3d 329, 335 (7th Cir. 1994).  Further, the ALJ must comply with SSR 96-7p in evaluating credibility.  <u>Lopez v. Barnhart</u>, 336 F.3d 535, 539-40 (7th Cir. 2003).

SSR 96-7p establishes a two step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness.  First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other

18

symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. SSR 96-7p.

Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit his ability to work. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p. The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); see also SSR 96-7p.

While SSR 96-7p does not require the ALJ to analyze and elaborate on each of these factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Windus, 345 F. Supp. 2d at 946. It further requires the ALJ to provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p.

19

###### 2. Analysis

In the present case, the ALJ found that plaintiff's complaints and allegations, considered in light of the objective medical evidence and the record as a whole, did not reflect an individual so impaired as to be incapable of engaging in any SGA. The ALJ acknowledged that plaintiff had been treated for various physical impairments. However, she noted that he was expected to recover from his recent wrist surgery within 12 months, and she nevertheless restricted him from jobs requiring constant use of the wrist. She further noted that he stood much of the time while volunteering five days per week for three hours. The ALJ also acknowledged that plaintiff had been treated for mental health problems, but noted that he could function at his volunteer job, which involved public contact. He was also able to live in a dorm setting, visit with and perform chores for his mother, and engage in various daily activities. She found that his mental impairments only moderately limited his daily activities, social functioning and concentration. Further, plaintiff's seizures were controlled with medication, and he had not experienced an attack in the last year. Finally, the ALJ noted that plaintiff received unemployment compensation for several months in 2001, indicating an ability to work. She concluded: "Overall, the claimant's complaints suggest a greater severity of impairment than is shown by the objective medical evidence and all of the above factors." (Tr. at 21.)

I first note that the ALJ did not rely on demeanor or other subjective considerations in making her finding; rather, she relied on objective factors. And, the factors cited by the ALJ do not withstand scrutiny.

First, the ALJ's reliance on plaintiff's volunteer work was misplaced. The ALJ stated that plaintiff stood most of the time while volunteering (Tr. at 21), but plaintiff testified that

out of three hours he stood for about one hour and was mostly sitting (Tr. at 601). This is an important point, given that the ALJ assigned plaintiff a "light" RFC, which would require him to be on his feet most of the day. See 20 C.F.R. § 404.1567(b). Further, plaintiff's ability to volunteer for three hours per day does not contradict his testimony that he cannot work full-time, i.e. eight hours a day, five days a week, SSR 96-8p, as is required at step five, see Kelley v. Apfel, 185 F.3d 1211, 1214-15 (11th Cir. 1999).[14] Finally, the ALJ failed to account for the limited nature of plaintiff's volunteer work, which consisted of handing out juice, toast and donuts for about an hour while standing; wrapping napkins, utensils and condiments for about an hour while sitting; wiping down tables for 15-20 minutes; and then sitting down to eat with the other volunteers for the balance of the three hours. (Tr. at 590; 601.) See Mersman v. Halter, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001) (reversing credibility determination based in part on claimant's volunteer activities where ALJ did not address the limited nature of those activities).[15]

Second, the ALJ relied on plaintiff's receipt of unemployment for several months in 2001. "Applying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability." Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir 1997) (internal quote marks omitted). However, plaintiff applied for social security benefits on

---

[14]The Commissioner contends that the fact that plaintiff did not volunteer full-time does not negate its relevance to his ability to work for sustained time periods. It is true that the ALJ must consider the entire record in evaluating credibility, and the ALJ did not directly equate this volunteer work with full-time employment. Nevertheless, the ALJ did appear to give this factor considerable weight, without discussing the very limited nature of the work or differentiating between volunteer and paid work, and incorrectly stating the amount of time plaintiff stood to do it.

[15]The ALJ's statement that plaintiff had public contact while volunteering was odd given that she restricted him from such contact in her RFC.

21

August 13, 2001, stating that his only source of income was food stamps and alleging a disability onset of April 20, 2001. (Tr. at 42; 100; 558.) Because the record does not reveal when in 2001 plaintiff collected unemployment, it is entirely possible that it was prior to his claiming disability. Without clarification, it was improper for the ALJ to rely on this factor.

Third, the ALJ relied on plaintiff's daily activities, including the chores he performed for his mother. However, the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) (citing Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005); Draper v. Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005); Kelley v. Callahan, 133 F.3d 583, 588-89 (8th Cir. 1998); Smolen v. Chater, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996)). While some weight is appropriate, the "pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." Id. In the present case, plaintiff testified that he did a few things around the house for his mother but added that he took breaks in between tasks. It is unlikely that an employer in the competitive work market would tolerate such a pace. Perhaps plaintiff was exaggerating his limitations in this regard, but the ALJ did not say so, instead implying that his activities undermined his claims.

Fourth, the ALJ failed to discuss any medication side effects. Plaintiff testified that his pills made him tired, drowsy and dizzy (Tr. at 589; 600) and complained of similar effects in his questionnaires (Tr. at 106; 142). The Commissioner concedes that the ALJ neglected this issue but notes that plaintiff never reported side effects to his doctors. (Tr. at 295; 300; 303; 505.) However, the ALJ did not make this point, and judicial review is limited to the

22

reason she gave.  Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).  It may be that given the medical records the ALJ's error was harmless, but given her other errors I am unwilling to so assume.

Fifth, although plaintiff testified about pain in several parts of his body (Tr. at 586-87) and the medical evidence demonstrated that plaintiff had several physical impairments that could cause pain, the ALJ specifically mentioned only the wrist impairment.  Of note, she failed to mention plaintiff's knee pain, which was an ongoing problem, and then found that he was capable of light work, which, as noted, requires a great deal of standing and walking. 20 C.F.R. § 404.1527(b).  Further, the ALJ assumed that plaintiff would recover from his wrist surgery within 12 months, but the most recent medical record stated that "there is no evidence of healing" (Tr. at 516), and plaintiff was still in a cast in September 2004, three months after his surgery.

Finally, the ALJ found plaintiff's testimony about his psychological symptoms less than credible because he could function in his volunteer job, lived in a dorm with other men, and visited his mother.  However, a social security claimant need not "vegetate in a dark room excluded from all forms of human and social activity."  Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981).  One can maintain contact with family and friends and yet have a disabling mental impairment.  Elbert v. Barnhart, 335 F. Supp. 2d 892, 910 (E.D. Wis. 2004) (reversing credibility determination based in part on claimant's relationship with family and friends); Mason v. Barnhart, 325 F. Supp. 2d 885, 904 (E.D. Wis. 2004) (reversing credibility determination based in part on claimant's interaction with friends and family, and occasional trips to the library and church).

23

For all of these reasons, the matter must be reversed and remanded for re-evaluation of plaintiff's credibility.[16]

## B.     Treating Source Reports

### 1.     Legal Standard

Treating source opinions must be given special consideration in social security cases. Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis.2001). If well-supported by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence, the ALJ must afford such opinions controlling weight. Id. (citing SSR 96-8p). Even if the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision." Wates v.

_____

[16]Plaintiff also argues that the ALJ erred in finding that he had been seizure-free for the past year. However, it is undisputed that plaintiff's last seizure was in November 2003 (Tr. at 303; 597), exactly one year before the ALJ issued her decision (Tr. at 24). Plaintiff asserts that the hearing was held in September 2004, and the ALJ did not know whether he had another seizure in the intervening two months. This is conjecture, and the ALJ is not required to continually update the record on the chance that something had changed. See Luna v. Shalala, 22 F.3d 687, 693 (7th Cir. 1994).

24

<u>Barnhart</u>, 274 F. Supp. 2d 1024, 1034 (E.D. Wis. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)).

However, in order to be considered a "treating source," the medical professional must be a "physician, psychologist, or other acceptable medical source." 20 C.F.R. 404.1502. Certain medical personnel, such as therapists and counselors, are not "acceptable medical source[s]." 20 C.F.R. § 404.1513(a); <u>Noe v. Apfel</u>, 6 Fed. Appx. 587, 588 (9th Cir. 2001). Rather, they are considered "other source[s]," 20 C.F.R. § 404.1513(d), and the ALJ is not required to apply the stringent treating source rule in evaluating their opinions, <u>Masch</u>, 406 F. Supp. 2d at 1055-56. Nevertheless, such opinions should not be ignored, and the ALJ is always required to explain how the evidence leads to her conclusions and how she resolved evidentiary conflicts. <u>Koschnitzke v. Barnhart</u>, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003) (collecting cases); <u>see also</u> <u>Barrett v. Barnhart</u>, 355 F.3d 1065, 1067-68 (7th Cir. 2004) (remanding for consideration of physical therapist's report); <u>Smith v. Shalala</u>, No. 93-C-2473, 1994 U.S. Dist. LEXIS 1549, at *11-12 (N.D. Ill. Feb. 14, 1994) (remanding for consideration of alcohol counselor's report).

**2.    Analysis**

In the present case, the ALJ declined to adopt Dr. San Augustin's RFC questionnaire because it was inconsistent with the evidence of record. The ALJ noted that the doctor's May 26, 2004 office record indicated that plaintiff had no hallucinations or delusions, and was coherent with good hygiene and grooming. Plaintiff also reported that he was not taking his medications as prescribed. The ALJ further noted significant gaps in plaintiff's treatment from 2001 to 2003, although he was seen more often in 2004, and that he was able to function as a volunteer and interact with his family. (Tr. at 21-22.) Finally, the ALJ rejected

25

the letter from AODA counselor Spielbauer based "on the above analysis of [plaintiff's] activities." (Tr. at 22.)

### a. Dr. San Augustin's Report

Plaintiff argues that the ALJ failed to cite any contrary medical evidence and otherwise failed to give good reasons for rejecting Dr. San Augustin's report. The Commissioner responds by pointing out the report's inconsistencies with those prepared by examining consultant Dr. Glassman and the state agency reviewers. She further notes that Dr. San Augustin's treatment notes did not provide any detailed objective findings to support his opinion or any record of specific clinical diagnostic testing during any of his sessions with plaintiff.

The problem with the Commissioner's position is that the ALJ did not adopt it. The ALJ did not contrast Dr. San Augustin's report with those from the consultants[17] and, aside from the May 2004 note, did not compare the report to Dr. San Augustin's treatment records. "[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [the court's] review to the reasons supplied by the ALJ." Steele, 290 F.3d at 941; see also Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) (holding that "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ").

_____

[17]The ALJ briefly referred to the consultants' reports on pages 2 and 3 of her decision and stated that in reaching her steps two and three conclusions she "considered the opinions of those who previously evaluated these issues, but who did not have the benefit of some of the above noted evidence." (Tr. at 20.) It appears that the ALJ was talking about the physical evaluations.

26

Further, the reasons the ALJ did provide are unconvincing. First, the ALJ's finding based on the lack of hallucinations or delusions was specious. It is true that Dr. San Augustin recorded no delusions or hallucinations in his May 26, 2004 note, but plaintiff never claimed to have such symptoms, and Dr. San Augustin did not list them in his RFC report. Rather, plaintiff and his doctor presented a depressive disorder typified by anergia, anhedonia and trouble concentrating. (E.g., Tr. at 506; 598-99.) Thus, the absence of hallucinations or delusions does not reasonably undercut Dr. San Augustin's report. Cf. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").[18]

Second, the ALJ ostensibly failed to consider the entire May 26 note, which indicates that plaintiff was "not doing so well, still depressed." (Tr. at 511.) While the note does indicate that plaintiff was not taking his pills as prescribed, it went on to state that the pharmacy was only giving him two tablets of 75mg of Effexor, which he took daily. Plaintiff further stated that he did not feel the medication was helping, so Dr. San Augustin added a new prescription. Dr. San Augustin further noted that plaintiff's mood was depressed, his affect was mood congruent, and his speech showed limited verbal responses, which were monotonous and non-spontaneous. (Tr. at 511.) Further, the ALJ failed to account for Dr.

---

[18]It is true that there is some overlap in the symptoms listed under the A criteria for Listing 12.03, Paranoid and Other Psychotic Disorders, and Listing 12.04, Affective Disorders (both include hallucinations and delusions, see 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.03 & 12.04), but plaintiff and his doctor never alleged hallucinations or delusions.

27

San Augustin's other treatment notes, which recorded major depressive disorder with continuing depressive symptoms (Tr. at 300; 302; 303), or the notes from Dr. Erdman, which similarly recorded severe depressive symptoms and a GAF of 45 (Tr. at 293; 295; 297-98). While the ALJ is not required to comment in writing on each piece of evidence, she may not simply select and discuss only that evidence which favors her ultimate conclusion. Smith v. Apfel, 231 F.3d 433, 438 (7th Cir. 2000).

Finally, the ALJ relied on the supposed inconsistencies between the report and plaintiff's daily activities. For the reasons discussed above, I cannot conclude that these limited activities constitute substantial evidence sufficient to outweigh a treating source report. See Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record[.]");[19] see also Miller v. Barnhart, 296 F. Supp. 2d 1269, 1275 (D. Kan. 2003) (reversing where ALJ rejected treating source report based on insignificant inconsistencies with claimant's daily activities).

_____

[19]In Hofslien v. Barnhart, 439 F.3d 375 (7th Cir. 2006), the court recently called for re-examination of the treating source rule. The court likened the rule to a "bursting bubble presumption" – when contrary evidence is introduced, "the rule drops out and the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." Id. at 377. The court went on to affirm the ALJ's rejection of the treating source's opinion in that case based on the reports of non-examining consultants. Id. at 376-77. This holding is at odds with Gudgel, which the Hofslien court did not cite, and which held that the "contradictory opinion of a non-examining physician does not, by itself, suffice" to reject an examining physician's opinion. 345 F.3d at 470. Thus, the status of the treating source rule in this circuit is uncertain. In any event, in the present case, the ALJ cited no substantial medical evidence – not even the reports of the SSA consultants – in rejecting Dr. San Augustin's report. Thus, the decision cannot stand even under Hofslien.

28

### b. Ms. Spielbauer's Report

Plaintiff also contends that the ALJ erred in rejecting the letter from Ms. Spielbauer. Plaintiff concedes that Spielbauer is not a treating source but contends that her opinion was entitled to serious consideration as an other source. The Commissioner responds that Spielbauer's opinion that plaintiff was "unemployable" trespassed into an area reserved to the Commissioner. <u>See</u> 20 C.F.R. § 404.1527(e)(1). However, Spielbauer offered more than a bald conclusion on the ultimate issue; she further stated that plaintiff's thought process was disjointed and his memory was poor. (Tr. at 181.) Although the ALJ could give Spielbauer's report less weight than that of a treating source, she was still required to provide a reasoned basis for rejecting it. <u>See</u> <u>Noe</u>, 6 Fed. Appx. at 588. As discussed above, plaintiff's daily activities alone are insufficient.

### c. The Matter Must be Remanded for Reconsideration

Because Dr. San Augustin's and Ms. Spielbauer's reports, if accepted, would lead to the conclusion that plaintiff is disabled, I cannot conclude that any error in considering them is harmless. <u>See</u> <u>Keys v. Barnhart</u>, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error doctrine to Social Security disability decision). Therefore, the matter must be reversed and remanded for consideration of these reports.

## C. RFC

### 1. Legal Standard

RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.

In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the individual. Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must also explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p.

### 2. Analysis

The ALJ found that plaintiff was capable of unskilled, simple, routine, repetitive work at the light exertional level that did not involve public contact, climbing, balancing, heights or hazards, or exposure to fumes, dust or other irritants, and only limited interaction with co-workers and frequent but not constant use of the hands. She stated that her finding was supported by the objective medical evidence as a whole and plaintiff's level of daily activity. (Tr. at 22.)

Plaintiff alleges that the ALJ provided no medical support for her conclusion, rejected the limitations contained in Dr. San Augustin's report without citing contrary evidence, and ignored Dr. Agha's May 27, 2004 note. In her response, the Commissioner cites medical evidence supporting the decision, including treatment notes and the reports of Dr. Hughes and the SSA consultants. Because the ALJ did not rely on this evidence, the

30

Commissioner's argument constitutes an improper post-hoc justification for the decision. See Windus, 345 F. Supp. 2d at 943 n.16 (rejecting post-hoc argument that agency consultant's report supported ALJ's decision). Nevertheless, regarding plaintiff's physical RFC, I can find no reversible error in the ALJ's failure to sufficiently explain herself because plaintiff cites no medical evidence supporting greater restrictions. Specifically, the report of treating source Dr. Hughes appears to be consistent with the ALJ's RFC. Similarly, I can find no reversible error in the ALJ's ignoring of Dr. Agha's note because it states only that plaintiff "is disabled for 6 months due to his medical condition." (Tr. at 504.) The note offers no specifics on plaintiff's conditions, it fails to satisfy the durational requirement for benefits, see 42 U.S.C. § 423(d)(1)(A), and it concerns an issue reversed to the Commissioner, 20 C.F.R. § 404.1527(e)(1).

However, with regard to plaintiff's mental RFC, the ALJ did commit reversible error. As discussed above, the ALJ failed to properly consider the report of Dr. San Augustin. Further, it is unclear whether the ALJ fully considered the mental RFC reports from the SSA consultants, who found that plaintiff had moderate limitations in 11 areas. The Commissioner contends that the ALJ's RFC finding, which was quite limited, was consistent with these reports, as well as that of Dr. Glassman. However, without some discussion in the decision, I cannot assume that. See SSR 96-6p (stating that findings made by consultants must be treated as expert opinion, and that ALJs "may not ignore these opinions and must explain the weight given to these opinions in their decisions"). Particularly given the other errors that require reversal and remand, I will remand for this reason as well.

31

**D. Hypothetical Questions**

**1. Legal Standard**

If the ALJ relies on testimony from a vocational expert, the hypothetical question she poses to the VE must incorporate all of the claimant's limitations. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). However, a hypothetical is not defective for failing to include each and every detail of the claimant's disability, provided there are indications that the VE reviewed the entire record prior to the hearing. Ragsdale v. Shalala, 53 F.3d 816, 820 (7th Cir. 1995). Further, the ALJ need not include in her questions limitations that she reasonably finds unsupported by the medical evidence. Ehrhart v. Sec'y of Health & Human Servs., 969 F.2d 534, 540 (7th Cir. 1992).

**2. Analysis**

In the present case, the ALJ posited several hypothetical questions to the VE. (Tr. at 602-04.) In her decision, she ruled against plaintiff at step five based on the VE's response to a question about the following hypothetical person: 44 years old, 12th grade education, with plaintiff's vocational history, with limitations of no climbing, balancing, working at heights or with hazards or environmental irritants, who could occasionally engage in postural movements, less than constant use of the hands, capable of unskilled, simple, routine, repetitive jobs, with no public contact and limited interaction with co-workers. The VE responded that such a person could work as an attendant/monitor, with 2400 positions existing at the light level. (Tr. at 604.)

Plaintiff argues that the ALJ failed to include the limitations contained in Dr. San Augustin's and the SSA consultants' mental RFC reports. He further argues that the ALJ

32

failed to consider that at the time of the hearing plaintiff's right wrist was still in a cast and Dr. Chamoy had him off work during his recovery, which according to the records was not progressing. He therefore argues that the ALJ should have obtained updated information from Dr. Chamoy.

Because I have reversed and remanded based on the ALJ's failure to fully and properly consider the reports of Dr. San Augustin and the SSA psychological consultants, the ALJ will have to revisit this issue with the VE on remand. Regarding plaintiff's wrist condition, the Commissioner notes that, although Dr. Chamoy excused plaintiff from work immediately after his surgery,[20] plaintiff failed to proffer any evidence that such condition disabled him for 12 months. I further note that plaintiff's lawyer was free to question the VE about the wrist condition and any resulting limitations. See Donahue v. Barnhart, 279 F.3d 441, 446-47 (7th Cir. 2002) (rejecting challenge to VE testimony where claimant's counsel failed to question him on the issue).

This issue demonstrates the tension between the principle that a social security claimant carries the burden of producing evidence of disability, see Scheck, 357 F.3d at 702 (citing 20 C.F.R. § 404.1512(c)), and that requiring the ALJ to fully and fairly develop the record, even when the claimant is represented by counsel, see Garza v. Barnhart, 397 F.3d 1087, 1089-90 (8th Cir. 2005); Young v. Barnhart, 282 F. Supp. 2d 890, 896 (N.D. Ill. 2003);

---

[20]Dr. Chamoy's note stated that plaintiff was unable to work after his surgery of 7//9/03 (Tr. at 529), but the medical records indicate that the surgery took place on July 9, 2004 (Tr. at 523-24). Further, according to the records, plaintiff first saw Dr. Chamoy in May 2004. (Tr. at 541-42.) Thus, it does not appear that Dr. Chamoy had plaintiff off work for more than a year before the September 2004 hearing, as plaintiff contends. Nevertheless, it is clear that plaintiff's wrist problem was of long-standing (Tr. at 183-84; 194-95) and thus satisfied the durational requirement for disabling impairments.

Case 2:05-cv-01120-LA   Filed 04/12/06   Page 33 of 34   Document 23

see also <u>Ray v. Bowen</u>, 843 F.2d 998, 1006 (7th Cir. 1988). Under the circumstances, where the case is being remanded based on other errors, I need not decide whether the ALJ also erred in this regard. On remand, plaintiff may submit additional evidence concerning his wrist condition, which the ALJ should consider along with the other evidence.

## IV. CONCLUSION

THEREFORE, IT IS ORDERED that the ALJ's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), sentence four. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 12th day of April, 2006.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

34